*This opinion is subject to revision before final publication in the Pacific Reporter*

**2013 UT 62**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

WEBER COUNTY,
*Plaintiff and Appellee,*

*v.*

OGDEN TRECE aka CENTRO CITY LOCOS; ROMAN HERNANDEZ;
CHASE AESCHLIMANN; JESSE AESCHILMANN; SAMUEL PARSONS;
JAIME GOMEZ; and WILLIE RODRIGUEZ; et al.,
*Defendants and Appellants*.

No. 20120852
Filed October 18, 2013

Second District, Ogden Dep't
The Honorable Ernest W. Jones
No. 100906446

Attorneys:

Christopher F. Allred, Dee W. Smith, Branden B. Miles,
Jeffrey G. Thomson, Ogden, for appellee

Randall W. Richards, Ogden, David C. Reymann, Lashel Shaw,
Michael S. Anderson, John Mejia, Salt Lake City, for appellants
Roman Hernandez, Chase Aeschlimann, and Jesse Aeschlimann

Michael P. Studebaker, Ogden, for appellants Samuel Parsons,
Jaime Gomez, and Willie Rodriguez

JUSTICE PARRISH authored the opinion of the Court,
in which CHIEF JUSTICE DURRANT,
ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE LEE,
and JUDGE ROTH joined.

Having recused herself, JUSTICE DURHAM does not participate
herein; Court of Appeals JUDGE STEPHEN L. ROTH sat.

JUSTICE PARRISH, opinion of the Court:

### INTRODUCTION

¶1     We are presented with two consolidated cases. The first is a direct appeal (Appeal) from an injunction entered against Ogden Trece (Trece), a criminal street gang. The second is a petition for

extraordinary writ (Petition) brought by three alleged Trece members who were served with the injunction.

¶2 Weber County (County) obtained a permanent injunction against Trece and its members under a public nuisance theory pursuant to section 76-10-806 of the Utah Code, which empowers a county attorney "to institute an action in the name of the county . . . to abate a public nuisance." The statutory definition of a public nuisance includes a criminal street gang. *See id.* §§ 78B-6-1101(2)(d), 78B-6-1107(1)(d); *see also id.* § 76-9-902(1) (defining a "[c]riminal street gang").

¶3 The injunction prohibits Trece members who have been served with a copy of it from associating with one another; confronting, intimidating, annoying, harassing, threatening, challenging, provoking, or assaulting any person known to be a witness or victim of any activity of Trece; possessing a firearm in public or any place accessible to the public; or violating an 11 p.m. to 5 a.m. curfew. It applies to a twenty-five square-mile "Safety Zone" encompassing nearly the entire city of Ogden. The injunction contains both a hardship provision and an opt-out provision.

¶4 Appellants and Petitioners argue that (1) service on Trece as an unincorporated association was improper and thus the district court lacked jurisdiction to enter the injunction, (2) the injunction violates procedural due process, and (3) the injunction violates substantive due process. In the event the injunction is vacated, they also argue that they are entitled to an award of attorney fees.

¶5 We lack appellate jurisdiction over the Appeal because the purported appellants are not parties to the proceeding. We do, however, have jurisdiction to consider the Petition. Although Trece is an unincorporated association and amenable to suit, we conclude that service on Trece was improper. The district court therefore lacked jurisdiction to enter the injunction. We deny the request for attorney fees.

### FACTUAL AND PROCEDURAL BACKGROUND

¶6 Ogden Trece is a criminal street gang that has operated for over thirty years. It has identifying signs, symbols, tattoos, graffiti, clothing, and hand signs. In its findings of fact and conclusions of law granting the permanent injunction, the district court found that members of Ogden Trece "commit crime for the purpose of intimidating rival gang members, asserting their dominance over an area, intimidating citizens and witnesses, and obtaining money

through many different types of illegal activities, from selling drugs to trafficking in stolen property." Revenue is brought into the gang by "criminal activity such as burglaries, thefts, robberies, drug dealing, etc." The day-to-day operations of the gang are directed by senior members called "shot callers." Less senior gang members are "put to work" by the "shot callers," meaning they are to "commit criminal activity to bring recognition and money into the gang." The proceeds from the criminal activities are given to the "shot callers" who "are [then] responsible for distributing money to members of the gang when they deem necessary."

¶7 On August 20, 2010, Weber County filed a complaint for permanent injunction to abate a public nuisance. It brought this action against Ogden Trece as an unincorporated association. The County also filed an application for a restraining order, preliminary injunction, and a request for hearing. The district court entered a temporary restraining order that same day.

¶8 On August 24, 2010, the County personally served five alleged Trece members: Evan Barrow, Emmanuel Montoya, Samuel Parsons, Roman Hernandez, and Daniel Callihan. The County also mailed process to twelve other alleged Trece members, namely: Jamie Gomez, Michael Gutierrez, Dario Muniz, David Maes, Nicholas Davis, Juan Saucedo, Darren Begay, Tyler Greenfield, Daniel Salinas, Troy Rivera Jr., Alex Mercado, and Elmer Maes.

¶9 Even though it had personally served gang members, the County sought an order allowing it to serve Trece by publication. At a hearing on August 31, 2010, the County attorney stated, without elaborating, "that we have adequately put the gang on notice, however, just to make sure that that's accomplished, we're going to request an order from the court to allow us to further put the gang on notice by publication." The attorneys and the court then turned to other issues. Near the conclusion of the hearing, the County attorney reminded the court of its motion, asking "would the court authorize us to publish?" The court responded, "[y]es, I will authorize service."

¶10 The County followed up two days later with a written motion requesting service by publication and a supporting affidavit. The County argued that it was "difficult if not impossible to give the gang 'notice' . . . and serve [it] under traditional methods contemplated by [r]ule 4 of the Utah Rules of Civil Procedure." Specifically, the County argued that Trece "do[es] not have a registered agent in the State of Utah or any other State," nor any

"known management structure, officers, directors, or like managerial personnel [on] which to personally serve with process." The district court entered a written order authorizing service by publication the following day. The County then published service of process in the *Ogden Standard Examiner* and on www.utahlegals.com.

¶11 On September 14 and 27, 2010, the district court held an evidentiary hearing on the County's request to convert the temporary restraining order to a preliminary injunction. The court heard testimony from two Ogden police officers who testified about the criminal and nuisance activity of Trece. The district court also heard testimony from a deputy district attorney from California who testified as an expert on the effectiveness of gang injunctions. Following the hearing, the district court converted the temporary restraining order to a preliminary injunction that included all the same prohibitions as the temporary restraining order, but also included a "Hardship Exemption Process" and an "'Opt Out' Provision."

¶12 The County then began serving the preliminary injunction on more than three hundred alleged members of Ogden Trece. Violation of the injunction is a class B misdemeanor punishable by up to six months imprisonment and up to a $1,000 fine. UTAH CODE § 76-10-807. Among those served were brothers Chase and Jesse Aeschlimann. Upon being served, the brothers filed a motion for a hearing to contest the constitutionality of the preliminary injunction, noting that neither of them had been served or given notice of the proceedings prior to the entry of the preliminary injunction or its service upon them. But neither brother moved to intervene in the action or request formal party status.

¶13 The district court ruled that because the gang as an entity had been sued and the constitutional arguments had "already been dealt with," individuals subsequently served with the injunction did not have a right to intervene or otherwise appear in the case or to challenge the terms of the injunction. It reasoned that due process had been satisfied because "[l]aw enforcement is required to serve the injunction on gang members, thus placing them on notice of the injunction."

¶14 On June 11, 12, and 14, 2012, the district court held an evidentiary hearing to consider whether to make the preliminary injunction permanent. No one representing Trece appeared at the hearing. However, despite the fact that none of their clients had

moved to intervene, three attorneys representing a total of eight individuals who had been served with the preliminary injunction attended the hearing. All of these attorneys noted that they represented only the individuals who had been served with the injunction and that they did not represent Trece itself. And none of the eight alleged members of Trece were present.

¶15 At the hearing, the district court heard evidence regarding Trece, why the County believed it to be a criminal street gang and a public nuisance, and how some of its members had previously been convicted of crimes. The district court found that Ogden Trece met the legal definition of a criminal street gang and a nuisance and that "the provisions of the injunction are narrowly drawn and are necessary to give . . . complete relief from [Trece's] nuisance activities."

¶16 At the conclusion of the hearing, the district court entered the permanent injunction (Injunction). The Injunction applies to the "Safety Zone," a twenty-five square-mile area encompassing most of the city of Ogden. It prohibits those alleged gang members served with it from engaging in specified conduct in the Safety Zone. Specifically, it prohibits the alleged gang members from any knowing association with gang members in public places or public view. This extends to "[d]riving, standing, sitting, walking, gathering, or appearing together with any known member of Ogden Trece anywhere in public view or anyplace accessible to the public." The Injunction also prohibits gang members from intimidating victims and witnesses. It states that Trece members are prohibited from "[c]onfronting, intimidating, annoying, harassing, threatening, challenging, provoking, [or] assaulting any person known to be a witness to any activity of Ogden Trece, known to be a victim of any activity of Ogden Trece, or known to have complained about any activity of Ogden Trece."

¶17 Another provision of the Injunction criminalizes possession of firearms, "imitation" firearms, ammunition, and "illegal weapon[s]," and prohibits alleged gang members from being in the presence of such weapons or another person possessing them. The Injunction imposes a curfew on alleged gang members between the hours of 11 p.m. and 5 a.m., "with exceptions for traveling to and from work, from any non-gang related entertainment event, school activities, and religious services," and "for emergencies, accidents or other situations that require[] immediate action to prevent serious bodily injury or loss of life." The Injunction also prohibits alleged gang members from damaging and defacing property through

5

graffiti, using and distributing drugs and drug paraphernalia, and consuming alcohol except in their homes or in properly licensed establishments. It also requires that alleged gang members "obey all laws."

¶18     The Injunction contains an "opt-out" provision under which an alleged gang member who has been served with it may "either renounce gang membership or declare that he or she never was a gang member." This requires a "declar[ation] that he or she has not been arrested for a 'gang-related' crime in the past three years, not associated with gang members for the past three years, and that the served person declare that he or she has not received any new gang tattoos."

¶19     The Injunction also contains a "hardship exemption process" under which an individual may seek exemption from the association and curfew provisions of the Injunction by written application

> request[ing] permission to associate only with a named individual or named individuals at specific times and in specific places when such association is reasonably necessary, or permission to be in a specific public place between 11[] p.m. and 5[] a.m. when it is reasonably necessary to be in a particular place at a particular time during those hours.

¶20     The County is now criminally enforcing the Injunction against those alleged gang members who have been served with it. Roman Hernandez, Samuel Parsons, Jamie Gomez, Willie Rodriguez, and brothers Chase and Jesse Aeschlimann, who have all been served with the Injunction, filed notices of appeal in the underlying action. Roman Hernandez, Chase Aeschlimann, and Jesse Aeschlimann also filed a petition for extraordinary writ directly with this court challenging the Injunction. We have jurisdiction pursuant to section 78A-3-102(2) of the Utah Code.

## STANDARD OF REVIEW

¶21     "Whether this court has jurisdiction over an appeal is a question of law that can be raised for the first time on appeal" by either party or by the court. *Navajo Nation v. State (In re Adoption of A.B.)*, 2010 UT 55, ¶ 21, 245 P.3d 711; *see also Kennecott Corporation v. Utah State Tax Commission*, 814 P.2d 1099, 1100 (Utah 1991). "When this court lacks jurisdiction over an appeal, it retains only the authority to dismiss the appeal." *In re A.B.*, 2010 UT 55, ¶ 21.

¶22 The issue of whether service of process on Trece was proper is "a question of law that we review for correctness." *Stichting Mayflower Mountain Fonds v. Jordanelle Special Service District*, 2001 UT App 257, ¶ 7, 47 P.3d 86. Likewise, whether the Injunction violates procedural or substantive due process are questions of law that we review for correctness. *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177 ("Constitutional issues, including questions regarding due process, are questions of law that we review for correctness.").

## ANALYSIS

### I. WE LACK APPELLATE JURISDICTION OVER THE APPEAL BECAUSE THE SO-CALLED APPELLANTS ARE NOT PARTIES TO THE CASE

¶23 Weber County and the purported appellants spend the entirety of their appellate briefs addressing four issues: adequacy of service of process, procedural due process, substantive due process, and attorney fees. But we see a more fundamental problem with this appeal. Specifically, the so-called appellants (Roman Hernandez, Chase Aeschlimann, Jesse Aeschlimann, Samuel Parsons, Jamie Gomez, and Willie Rodriguez) are not parties to the action and thus are not entitled to appeal the Injunction.

¶24 In *Utah Down Syndrome Foundation, Inc. v. Utah Down Syndrome Association*, we held that we lacked appellate jurisdiction over the case because the individual attempting to appeal was not a party and thus did not have the right to appeal. 2012 UT 86, ¶ 1, 293 P.3d 241. We explained that the appropriate vehicle through which he could challenge the district court's order was a petition for extraordinary writ. *Id.* ¶ 12.

¶25 In that case, the district court "issued an order and judgment purporting to affect the interests of a nonparty," Mr. Gilbert. *Id.* ¶ 13. Mr. Gilbert never filed a motion to intervene, but sought to appeal the judgment. *Id.* We held that "[b]ecause he was never a party . . . Mr. Gilbert does not have an appeal as of right, and his attempt to appeal was improper." *Id.* We therefore concluded that we lacked jurisdiction and were required to dismiss the case. *Id.*

¶ 26 In this case, the only named defendant is Ogden Trece. The only person or entity that attempted to intervene was the American Civil Liberties Union (ACLU). But its motion to intervene was denied and it has not appealed that ruling. None of the so-called appellants in this appeal were named as parties to the action and none sought to intervene. Rather, their attorneys simply

showed up to court hearings and were somehow allowed to be heard, despite the fact that they were technically mere spectators. Indeed, when entering their appearances in the hearings, the attorneys were careful to note that they were representing individual alleged gang members and *not* the gang. For example, in one instance, Michael Studebaker introduced himself as counsel "for Samuel Parsons, Jaime Gomez, and Willie Rodriguez and nobody else, and no[t] the gang in itself." Another attorney, Randall Richards, stated, "I represent Roman Hernandez, Chase Aeschlimann, and Jesse Aeschlimann. . . . Oh, and by the way, I do not represent the gang, whatever that happens to be." Michael Boyle stated he was representing "Emmanuel Montoya, Andrew Callahan. And again, I don't represent Ogden Trece or Centro City Locos."

¶27   Although Jesse Aeschlimann never actually moved to intervene, the district court raised and then rejected the possibility of intervention in a memorandum decision. It stated:

> Jesse Aeschlimann has failed to file a motion to intervene as required under [r]ule 24, URCP. The [c]ourt finds Jesse Aeschlimann should not be permitted to intervene as a matter of right or as a permissive intervenor. The interests of Ogden Trece are already being adequately represented by two attorneys. Many of the issues raised by Jesse Aeschlimann in his memorandum were addressed by the [c]ourt in two memorandum decisions on April 4, 2011. Allowing permissive intervention for Jesse Aeschlimann would cause undue delay and require the [c]ourt to revisit issues already ruled on. Permissive intervention would require the [c]ourt to restart the litigation. . . . The [c]ourt will deny Jesse Aeschlimann's motion to intervene.

¶28   Since none of the so-called appellants are parties to the case, they are not entitled to an appeal as of right. *See, e.g., Utah Down Syndrome,* 2012 UT 86, ¶ 9 (stating that the appellant "as a nonparty, is not entitled to appeal"); *Brigham Young Univ. v. Tremco Consultants, Inc.*, 2005 UT 19, ¶ 46, 110 P.3d 678 (noting that "nonparties . . . cannot appeal the [court] order"). "Under our rules, it is the service of process, the affirmative act of filing suit, or the act of seeking to intervene as a party that subjects one to the jurisdiction of the court and puts him on notice that he is subject to ongoing court proceedings." *Utah Down Syndrome*, 2012 UT 86, ¶ 18. Mere notice of or appearance in proceedings is not enough. Even though

the district court allowed the so-called appellants to be heard, they were not named parties and never filed motions to intervene. They were therefore not entitled to appeal and we lack appellate jurisdiction over the appeal. *Id.* ¶ 12.

## II. WE HAVE JURISDICTION TO CONSIDER THE PETITION FOR EXTRAORDINARY WRIT FILED BY ROMAN HERNANDEZ, CHASE AESCHLIMANN, AND JESSE AESCHLIMANN

¶29 Roman Hernandez, Chase Aeschlimann, and Jesse Aeschlimann (Petitioners) filed a petition for extraordinary writ directly with this court. Pursuant to the Utah Constitution, we have "original jurisdiction to issue all extraordinary writs." UTAH CONST. art. VIII, § 3. This is the proper vehicle by which nonparties to a lawsuit may challenge a district court's order. *Brigham Young Univ. v. Tremco Consultants, Inc.*, 2005 UT 19, ¶ 46 n.7, 110 P.3d 678. "[A] petition for extraordinary writ filed with the appellate court provides an adequate remedy in light of the appellate court's obligation to give due regard to principles of due process." *Utah Down Syndrome Found., Inc. v. Utah Down Syndrome Ass'n*, 2012 UT 86, ¶ 22, 293 P.3d 241. Thus, we have jurisdiction to consider their petition and turn to the merits of their claims.

## III. TRECE IS AN UNINCORPORATED ASSOCIATION THAT IS AMENABLE TO SUIT

¶30 Petitioners first challenge the district court's jurisdiction over Trece, arguing that a criminal street gang is simply not amenable to suit. Weber County brought suit against Trece as an unincorporated association. Petitioners argue that in order for an unincorporated association to be sued, it must exist for a lawful purpose and must transact business under a common name. They reason that Trece meets neither requirement because it exists for illegal purposes and does not transact business under a common name. The County responds that a street gang is specifically listed as a public nuisance under Utah Code section 78B-6-1101(2)(e) and that section 76-10-806 allows a county attorney "to institute an action in the name of the county . . . to abate a public nuisance." It therefore reasons that "Utah law . . . recognizes that a criminal street gang is a jural entity and contemplates its being amenable to a public nuisance abatement action." We agree with the County that Trece is amenable to suit, but we reach that conclusion based on alternative grounds.

¶31 We first turn to Petitioners' argument that Trece is not

subject to suit as an unincorporated association because "a fundamental requirement of an unincorporated association is that it be formed for a lawful purpose." Petitioners rely on two cases from other jurisdictions for this proposition. The first is *People ex rel. Reisig v. Broderick Boys*, in which a California court relied on a California statute that defined an unincorporated association as "an unincorporated group of two or more persons joined by mutual consent *for a common lawful purpose.*" 59 Cal. Rptr. 3d 64, 74 (Cal. Ct. App. 2007) (quoting CAL. CORP. CODE § 18035, subd. (a) (internal quotation marks omitted)). But that case is unpersuasive inasmuch as no such statutory requirement of lawful purpose exists in Utah.

¶32     The second case on which Petitioners rely is similarly inapposite. In *Peoples Gas System, Inc. v. Acme Gas Corporation*, a Florida court stated in a footnote that an unincorporated association is "*[g]enerally* 'created and formed . . . for the accomplishment of some lawful purpose.'" 689 So. 2d 292, 298 n.8 (Fla. Dist. Ct. App. 1997) (emphasis added) (quoting 4 FLA. JUR. 2D *Associations & Clubs* §§ 1, 2 (1994)). We do not disagree with this proposition. However, the fact that unincorporated associations are *generally* formed for lawful purposes does not suggest that they may *only* be so.

¶33     Rule 17(d) of the Utah Rules of Civil Procedure provides that "[w]hen two or more persons associated in any business . . . not a corporation, transact such business under a common name, . . . they may sue or be sued by such common name." *See also Hebertson v. Willowcreek Plaza*, 923 P.2d 1389, 1391–92 (Utah 1996). Neither the rule nor any other provision of Utah law contains any requirement that unincorporated associations be engaged in lawful activity before they are amenable to suit. Thus, Trece is amenable to suit as an unincorporated association so long as it transacts business under a common name. *Id.* at 1392.

*A. Trece Conducts Business*

¶34     Petitioners argue that "there is no evidence in the record of Trece transacting business" and that the County conceded that "Ogden Trece exists *only* as a criminal organization." They contend that criminal organizations do not "transact business" but rather commit crimes. We disagree. There is no logical reason why business transactions and criminal activity are mutually exclusive.

¶35     In interpreting the language of a clear and unambiguous statute or rule, "our duty is to give effect to [its] plain meaning." *State ex rel. Z.C.*, 2007 UT 54, ¶ 11, 165 P.3d 1206. The caveat is that "a court should not follow the literal language of a statute if its plain

meaning works an absurd result." *Savage v. Utah Youth Village*, 2004 UT 102, ¶ 18, 104 P.3d 1242.

¶36    "Business" is defined as "a particular occupation or employment habitually engaged in for livelihood or gain." BLACK'S LAW DICTIONARY 226 (9th ed. 2009); *see also id.* ("By extension, transactions or matters of a noncommercial nature <the courts' criminal business occasionally overshadows its civil business>."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 302 (a "particular field of endeavor," or "an immediate task or objective"). There is nothing in the definition requiring that the occupation or employment be legal,[1] and there are ample findings by the district court to support the conclusion that Trece satisfies the definition. It "obtain[s] money through many different type[s] of illegal activities, from selling drugs to trafficking in stolen property." The gang's revenue is generated through "criminal activity such as burglaries, thefts, robberies, drug dealing, etc." Additionally, once the money is "earned," it is then distributed to other gang members.

¶37    These findings by the district court were supported by ample evidence. Testimony during the evidentiary hearing demonstrated that Trece has a remarkably organized structure and governance. Gang members know who the "shot callers" are in any given area. There is a hierarchy within the gang that administers discipline and puts out orders for "work." It is the "shot caller's" responsibility to make "sure that everybody's paid, everybody's got money, [and] everybody is doing good." Most of the stolen goods and money earned from drugs is given to the senior members, but the individuals who steal the goods or sell the drugs keep a certain portion. The "shot caller" keeps a portion of the profits for himself and the remaining profit is retained for the use of the gang in order

---

[1] *See also J.M. & M.S. Browning Co. v. State Tax Comm'n*, 154 P.2d 993, 996 (Utah 1945) (stating that what constitutes transacting business must be determined within the context in which the phrase is used); *Graham v. Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist.*, 1999 UT App 136, ¶ 11, 979 P.2d 363 (noting that "as unincorporated associations such as social clubs, religious organizations, environmental societies, athletic organizations, condominium owners, lodges, stock exchanges and veterans began to proliferate, courts recognize[d] that . . . [s]uch groups must . . . [face] liability to suit." (first alteration in original)(emphasis omitted) (internal quotation marks omitted)).

to pay for lawyers, to support families, and to pay for other general expenses.

¶38 This evidence satisfies the requirement of rule 17(d) and there is no need for us to depart from the plain meaning of the rule. *See Savage*, 2004 UT 102, ¶ 18. There is no reason why an unincorporated association should be immune from suit simply because the business in which it engages is unlawful. Under Petitioners' proposed interpretation of the rule, a criminal organization would be immune from suit simply because the business it transacts is illegal. But it would be illogical to interpret rule 17(d) in a manner that allows organizations that operate illegally to escape suit when such organizations are exactly the kind of enterprise on which the justice system should be brought to bear.

### B. *Trece Conducts Business Under a Common Name*

¶39 We also conclude that Trece meets the second requirement of rule 17(d) in that it operates under a common name. The district court found that "Ogden Trece has, as a group, an identifying name or identifying symbol or both." Additionally, "Trece has identifiable hand signs, gestures, and clothing . . . that distinguishes [it] from other criminal street gangs." Trece members are required to "put in work," meaning committing the type of criminal transactions listed above "to bring recognition and money into the gang." And these findings were amply supported by evidence that was admitted during the evidentiary hearing.

¶40 Duane Dreamer, a self-identified "shot caller" in Trece, testified that the two main rules of the gang are to not "rank out" and to "represent to the fullest," which means to "always let everybody know where you are from." The gang very jealously protects its own name. It goes to great lengths in order to protect its brand. It has internal processes for induction of new members and advancement into leadership positions. It also punishes individuals who falsely attempt to identify themselves as gang members. Members who are "jumped out" of the gang must cover up their tattoos and no longer claim membership in the gang.

¶41 Trece derives its power and influence in the community from exactly this type of "representing." It is one of the two cardinal rules of the gang that members represent the gang wherever they go. This representation by the members' clothing, the gang signs, the tattoos, and the graffiti has the effect of making the gang almost omnipresent in the community. Trece's presence is felt even when its members are not engaged in gang-related activity because they

constantly use the name of the gang and "represent." Indeed, the very identity of gang members is tightly interwoven with the name of the gang.

¶42 Based on the foregoing, we have no difficulty concluding that Trece transacted its business under a "common name" under rule 17(d). Because Trece (1) transacts business (2) under a common name, it is an unincorporated association amenable to suit.

## IV. TRECE WAS NOT PROPERLY SERVED WITH PROCESS

¶43 Having concluded that Trece qualifies as an unincorporated association subject to suit, we now examine whether Trece was properly served with process. Petitioners argue that Trece was not properly served because rule 4(d)(1)(E) requires that service on unincorporated associations be made upon "an officer, a managing or general agent, or other agent authorized by appointment or by law to receive service of process" and that no such managing agent of Trece was served. UTAH R. CIV. P. 4(d)(1)(E). The County responds that Trece was properly served by publication under rule 4(d)(4)(A) because the identities of Trece's managing agents were unknown.

¶44 "For a court to acquire jurisdiction, there must be a proper issuance and service of summons." *Jackson Constr. Co. v. Marrs*, 2004 UT 89, ¶ 10, 100 P.3d 1211. Under Utah law, a "statute or rule of court" provides for the manner of service to be employed. *Lloyd v. Third Judicial District Court*, 495 P.2d 1262, 1263 (Utah 1972).

¶45 Rule 4 of the Utah Rules of Civil Procedure contemplates two possible ways to serve unincorporated associations such as Trece. First, rule 4(d)(1)(E) provides that personal service may be made on "an unincorporated association which is subject to suit under a common name, by delivering a copy of the summons and the complaint to an officer, a managing or general agent, or other agent authorized by appointment or by law to receive service of process."

¶46 Service on a street gang like Trece is possible under rule 4(d)(1)(E) by delivering a copy of the summons and complaint to the functional equivalent of an officer or managing or general agent of the gang. Testimony presented to the district court indicated that Trece has a management structure in which certain gang members known as "shot callers" have achieved a level of status and recognition that few gang members will ever achieve within the gang. These shot-callers are tasked with giving orders to other

members. However, the County never argued that Trece's "shot callers" were the functional equivalent of an officer or managing or general agent of the gang.

¶47 Five alleged gang members were personally served with the summons and complaint. But the County never alleged that any of the served members were the functional equivalent of an agent or officer. And service on mere members of an unincorporated association is inadequate under rule 4 to effectuate service on the organization. *See Beard v. White, Green & Addison Assocs., Inc.* 336 P.2d 125, 126 (Utah 1959) ("Under [rule 4] the person served must be more than a mere employee."). As such, there was no valid service on Trece under rule 4(d)(1)(E).

¶48 The second possible method of serving an unincorporated association such as Trece is provided by rule 4(d)(4). It states that "[w]here the identity or whereabouts of the person to be served are unknown and cannot be ascertained through reasonable diligence . . . the party seeking service of process may file a motion supported by affidavit requesting an order allowing service by publication." UTAH R. CIV. P. 4(d)(4)(A). Therefore, if the County were unable to identify an officer or a managing or general agent of the gang after exercising reasonable diligence in attempting to do so, the court could order service on the gang through publication.

¶49 The County argues that service on Trece by publication was valid because the identity of the functional equivalent of an agent or officer was unknown. But the rule requires more. The party seeking to effectuate service through publication must exercise reasonable diligence in attempting to identify and then personally serve an officer or managing or general agent or his equivalent. *See Jackson Constr.*, 2004 UT 89, ¶ 11 (stating that "litigants may not resort to service by publication until they have first undertaken reasonably diligent efforts to locate the party to be served").

¶50 We have stated that "[a] determination of reasonable diligence . . . properly focuses on the plaintiff's efforts to locate the defendant." *Id.* ¶ 15 (emphasis omitted). "Relevant factors may include the number of potential defendants involved, the projected expense of searching for them, and the number and type of sources of available information regarding their possible whereabouts." *Id.*

¶51 This reasonable diligence requirement arises from the non-adversarial nature of motions seeking authorization to serve by publication. By definition, a motion seeking service by publication will be unopposed because the party to be served is necessarily

unavailable. Thus, the reasonable diligence requirement serves as a check to ensure that service by publication is only authorized in extraordinary circumstances. Such motions should be granted only where the district court is satisfied that the requesting party has indeed exercised reasonable diligence by undertaking specific steps to ascertain the identity and whereabouts of the person to be served.

¶52    The County failed to meet this burden. At the August 31, 2010 hearing, the County moved for alternative service by publication stating only that the "County's position is that we have adequately put the gang on notice, however, just to make sure that's accomplished, we're going to request an order from the court to allow us to further put the gang on notice by publication." At no time during the hearing did the County make any assertions that it had exercised reasonable diligence in attempting to identify or serve an officer or a managing or general agent of Trece. Yet, at the end of the hearing, the court indicated its willingness to authorize service by publication.

¶53    The County subsequently filed a written motion for service by publication under rule 4(d)(4). But the written motion contained nothing to indicate that the County had exercised reasonable diligence in attempting to identify and serve a Trece officer or managing or general agent or equivalent. The affidavit submitted by the County in support of its motion asserted only that "[t]here are approximately 485 known members of Ogden Trece that live in our community so locating and serving each individual would be impracticable and difficult." It then described the steps it had undertaken to personally serve five members of the gang and stated that "Ogden Trece, as an unincorporated association, does not have a known management structure, officers, directors, or like managerial personnel for which to personally serve with process."

¶54    The County's affidavit did not address whether it had diligently attempted to identify and serve Trece's officers or managing or general agents. Its conclusory allegation that Trece had "no known management structure, officers, directors or like managerial presence" was a statement reflecting only the state of the County's knowledge. It shed absolutely no light on what, if any, steps the County had taken to gather more information regarding Trece's management structure. Moreover, that conclusory statement was later refuted by the County's own witness, Duane Dreamer, who offered extensive testimony as to Trece's structure and organization.

¶55 Dreamer testified that "Ogden Trece's shot callers were aware of the Injunction and met to discuss what to do about it." But the fact that Trece "shot callers" may have been aware of the Injunction neither displaces the requirements of personal service nor excuses the County's failure to demonstrate that it exercised reasonable diligence before seeking service by publication. *Murdock v. Blake*, 484 P.2d 164, 167 (Utah 1971) ("Service of summons in conformance with the mode prescribed by statute is deemed jurisdictional, for it is service of process, not actual knowledge of the commencement of the action, which confers jurisdiction.").

¶ 56 The County simply relies on its bald assertion that Trece has no known management structure. But this is uninformative because it does not describe any steps that the County took to try and ascertain Trece's management structure or to identify and personally serve the functional equivalent of an officer or a managing or general agent. Such conclusory statements lacking any underlying factual support are simply insufficient to justify an order of service by publication. We have held that "such an affidavit is not sufficient if it states mere conclusions as to diligent search and inquiry. It must set forth facts upon which the court can base a judgment as to whether such diligence has been exercised to meet that requirement." *Downey State Bank v. Major-Blakeney Corp.*, 545 P.2d 507, 509 (Utah 1976); *see also Jackson Constr.*, 2004 UT 89, ¶ 21 n.3 (stating that "Jackson Construction's conclusory allegation of diligence is insufficient to meet rule 4's diligence requirement").

¶57 The County did not explain why it was unable to identify or locate the functional equivalent of an officer or a managing or general agent, even though it has an extensive gang database with information on 485 active gang members. This court has previously stated that "[t]o meet the reasonable diligence requirement, a plaintiff must take advantage of readily available sources of relevant information" and cannot "turn[] a blind eye to the existence of other available sources." *Jackson Const. Co.*, 2004 UT 89, ¶ 20. Yet the County provided no indication as to whether its database includes information on gang members serving as the functional equivalent of an officer or a managing or general agent.

¶58 In its order for alternative service, the district court stated: "Having reviewed the Motion for Alternative Service by Publication, and heard the arguments [made by the County at the hearing], and for Good Cause shown in its attached affidavit, IT IS HEREBY ORDERED, that" the County shall publish service. But nothing offered by the County in either the hearing or the affidavit

demonstrates that the County was reasonably diligent in attempting to identify the functional equivalent of an officer or a managing or general agent of Trece.

¶59    The County argues that service by publication was necessary because there are 485 known gang members and personal service on all members would be impracticable. This argument misapprehends the controlling law, however, since rule 4(d) requires a showing that it would be impracticable to personally serve an officer or a managing or general agent. Nothing in the rule requires personal service on all 485 individual members of the gang. And the County's explanation of its personal service on five members is similarly uninformative since its service on five individual gang members sheds no light on the County's diligence in attempting to identify and serve an officer or managing or general agent.

¶60    Because the County did not serve any of Trece's officers or managing or general agents or their functional equivalent and did not establish a sufficient factual basis for service by publication under rule 4, Trece was not properly served. And Trece was the only defendant named in the lawsuit. Because the district court lacked jurisdiction over the only named defendant, the Injunction is void.

## V.  WE DECLINE TO AWARD ATTORNEY FEES

¶61    The final issue we must address is whether Petitioners are entitled to an award of their attorney fees incurred in connection with their petition for extraordinary writ. Petitioners submit they are entitled to recover their attorney fees because they have been wrongfully enjoined.

¶62    In support of their request for fees, Petitioners cite to rule 65A(c)(2) of the Utah Rules of Civil Procedure. But the language of rule 65A does not support their request. Rule 65A speaks of costs and fees "incurred in connection with [a] *restraining order or preliminary injunction*," not a permanent injunction like the one at issue here. UTAH R. CIV. P. 65A(c)(2) (emphasis added).[2]  And even

---

[2] *See Hay v. Baumgartner*, 903 N.E.2d 1044, 1048 (Ind. Ct. App. 2009) (interpreting a parallel rule and explaining that the require- ment of security and prescription for award of costs and damages for wrongful entry of injunction "arise[] from the expeditious manner in which the preliminary injunctive relief is issued and to the lack of a full hearing upon the facts"—considerations that "do

(continued...)

in the case of a preliminary injunction, the language does not appear to give rise to an independent right to recover fees. Rather, it simply indicates that the amount of the security given by the party seeking an injunction does not limit the amount of attorney fees that may be recovered in the event that an injunction is wrongfully entered. UTAH R. CIV. P. 65A(c)(2).[3]

¶63     Petitioners also cite to *Green River Canal Company v. Thayn*, 2003 UT 50, 84 P.3d 1134. However, like rule 65A, *Thayn* involved a temporary restraining order that was later dissolved after an evidentiary hearing on the preliminary injunction motion—not a permanent injunction. *Id.* ¶ 13. Thus, the authority invoked by Petitioners is focused on the wrongful entry of a temporary restraining order or preliminary injunction, rather than the wrongful entry of a permanent injunction. Petitioners have failed to articulate any argument  or cite to any authority supporting their entitlement to an award of attorney fees when a permanent injunction is vacated. We accordingly deny their request for fees.

## CONCLUSION

¶64     Because the individuals who filed the Appeal are not parties to the underlying lawsuit, they do not have the right to appeal and we lack jurisdiction over the Appeal. But we do have jurisdiction over Petitioners' alternative petition for extraordinary writ and vacate the Injunction due to insufficient service of process on the only named defendant, Ogden Trece. Ogden Trece transacts business under a common name and it is amenable to suit as an unincorporated association. It may be served through personal service on the functional equivalent of an officer or a managing or general agent or by publication if the identity or whereabouts of such an individual is unknown and cannot be ascertained through reasonable diligence. In this case, however, service by publication was not warranted because the County failed to demonstrate that it had exercised reasonable diligence in attempting to identify an officer or a managing or general agent of Trece before requesting alternative service. The district court therefore lacked jurisdiction over Trece and the Injunction is void.

---

[2](...continued)
not [exist] in the case of a permanent injunction entered following a trial on the merits").

[3] Indeed, it appears that the right of a wrongfully enjoined party to recover attorney fees in certain situations actually arises under the common law. *See* 43A C.J.S. *Injunctions* § 464.

Opinion of the Court