2004 UT 102

Jake SAVAGE, Jana Savage, and Jake Savage as guardian for and on behalf of John Doe, Plaintiffs and Appellants,

v.

UTAH YOUTH VILLAGE, a Utah Corporation, Defendant and Appellee.

No. 20030087.

Supreme Court of Utah.

Dec. 3, 2004.

Fred R. Silvester, Spencer Siebers, Salt Lake, for plaintiffs.

Dale J. Lambert, Karra J. Porter, Salt Lake, for defendant.

Von G. Keetch, Alexander Dushku, Salt Lake, Amicus Curiae.

DURHAM, Chief Justice:

¶ 1 Plaintiffs Jake and Jana Savage, on behalf of their minor son John Doe, appeal the district court's grant of summary judgment to defendant Utah Youth Village (the Village). The Savages sued the Village for various claims arising from the Village's placement of a juvenile in their home who subsequently molested their three-year-old child. The district court held that the Savages' claims are barred by Utah Code section 78–12–25.1. The Savages raise four issues on appeal: (1) whether the district court abused its discretion in granting the Village's motion to amend its answer to include the statute as a defense; (2) whether negligent placement is a cognizable claim under Utah law; (3) whether Utah Code section 78–12–25.1 is a delayed discovery statute of limitation designed to give victims of child sexual abuse with repressed memories the opportunity to sue certain individuals upon recollection of the sexual abuse, and not, as the district court held, a statute that "created and defined" a new cause of action; and (4) whether the statute, as interpreted by the district court, violates Utah's constitutional guarantees of open courts and uniform operation of laws.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶ 2 The Village is a private, non-profit Utah corporation that provides treatment and help for youth with "mild emotional or behavioral problems, a minimal delinquent record and/or difficulty with interpersonal relationships," and also places youth in foster homes. The Village contracts with foster, or "treatment," parents and places treatment youth in these parents' homes. For each child, the Village is required to maintain a confidential file containing the child's psycho-social, psychiatric, and therapy information, as well as other confidential documents. The file is secured at the Village offices, and foster parents can have access when they visit. In addition, the Village is required to maintain an "Out–of–Home Placement Information Record," or "Traveling File," that accompanies the child to every foster home and contains a record of the child's mental health and medical and delinquency history.

¶ 3 In 1996, the Savages approached the Village about their desire to work as foster parents. In preparation for this responsibility, they attended training meetings where they learned that foster children have often been abused, are frequently at risk to abuse other children, and should not at any time be left alone with other children in the foster home. After completing their training, the Savages took in five different foster children between 1996 and 1997. After a break from working as foster parents, they again decided to become foster parents in May 1999, this time for sex offender youth. The Savages understood these children to have fewer behavioral problems and to require less paperwork to monitor their progress. The Savages also desired the extra income that fostering sex offender youth provided. Before assuming this responsibility, the Savages met with the Village treatment director, Jeff Simpson, who emphasized the precautions they must take to protect their own children, including never leaving their children alone with a treatment youth.

¶ 4 From August to November 1999, the Savages took in three different youth sex

offenders. The Village provided the Savages with the Traveling Files for each youth, at least two of whom had histories of sexual offenses arguably more serious than the fourth youth, J.B., whom the Village placed with the Savages in December 1999. Shannon Morris, the Village's consultant to foster parents, had been unable to obtain J.B.'s Traveling File, which detailed his sexual history and criminal record, from his caseworker, who had been fired by the Village at the time Morris placed J.B. in the Savages' home. Instead, Morris orally described J.B. to the Savages, allegedly downplaying his history of sexual offenses and promising that he would be a "good kid." The Savages claim that despite their many requests and Morris's persistent promises to find and bring the Traveling File to them, neither she nor anyone else at the Village provided them with J.B.'s Traveling File, which contained his criminal record.

¶ 5 Jake Savage learned something more of J.B.'s criminal history of sexual abuse when he accompanied J.B. to a court hearing on January 4, 2000, where the mother of one of J.B.'s young victims addressed the court. During the drive home from the hearing, in response to Jake's inquiry, J.B. revealed that he had committed sexual offenses against eighteen victims. The following night, January 5, 2000, after Jake Savage had gone to work a night shift, Jana Savage and her three-year-old son, John Doe, were watching television or reading a book in the Savages' living room while J.B. lay on the floor doing his homework. At one point, Jana left the room for an estimated ten minutes to check on her ten-month-old son who had started crying in his crib. While Jana was absent from the living room, J.B. sexually abused John Doe.

¶ 6 Within one year of the abuse, the Savages sued the Village for negligent placement, fraud, breach of contract, and negligent infliction of emotional distress. In September 2002, the parties completed discovery, certified the case for trial, and prepared for the trial date of January 14, 2003. On November 8, 2002, the Village filed a motion for summary judgment claiming that Utah Code section 78–12–25.1 barred the Savages' claims. The Village argued that the statute limited all civil actions for sexual abuse of a child in Utah to abuse by a "living person," not a corporate entity such as the Village.

¶ 7 The Savages argued that the statute did not apply as a bar to their claims, would be unconstitutional if applied as the Village urged, and was an affirmative defense that the Village had never pled and had therefore waived. The district court granted the Village's motion to amend its answer and its motion for summary judgment. This appeal followed.

## ANALYSIS

### I. THE DECISION TO ALLOW THE VILLAGE TO AMEND ITS ANSWER

¶ 8 The Savages argue that the district court abused its discretion in granting the Village's motion to amend its answer because the Village requested the amendment late in the litigation, it should have been aware of the statute when the complaint was filed, and it offered no adequate justification for the untimely nature of its request.

¶ 9 The district court's decision to allow amendment of the pleadings is reviewed for "abuse of discretion resulting in prejudice to the complaining party." *Norman v. Arnold*, 2002 UT 81, ¶ 38, 57 P.3d 997. Utah Rule of Civil Procedure 15(a) states that leave to amend pleadings "shall be freely given" by the court "when justice so requires." Utah R. Civ. P. 15(a). The court's ultimate goal is to have the "real controversy between the parties presented, their rights determined, and the cause decided," *Johnson v. Brinkerhoff*, 89 Utah 530, 57 P.2d 1132, 1136 (1936), so the court should "allow amendments freely where justice requires, and especially is this true before trial." *Gillman v. Hansen*, 26 Utah 2d 165, 486 P.2d 1045–46 (1971) (internal quotations

omitted). Another "prime consideration" is whether the nonmoving party had adequate "opportunity to meet the newly raised matter." *Lewis v. Moultree,* 627 P.2d 94, 98 (Utah 1981). Further, in deciding whether to grant a motion to amend, Utah courts should consider the following factors: "(1) the timeliness of the motion; (2) the justification for delay; and (3) any resulting prejudice to the responding party." *Swift Stop, Inc. v. Wight,* 845 P.2d 250, 253 (Utah Ct. App.1992).

¶ 10 Here, the Village filed its motion four weeks before the trial date, giving the Savages a month to research and address the newly raised statute. The Savages did in fact respond to the arguments based on section 78–12–25.1, raising numerous points in opposition to its application. Although the Village moved to amend eleven months after the deadline to amend had passed, three months after the case was certified for trial, and four weeks before trial, thus pressing the outer limits of timeliness, we conclude that no prejudice to appellants is apparent, and the district court acted within its broad discretion when it granted the Village's motion to amend its answer to include the Village's argument regarding section 78–12–25.1(5).

## II.  EXISTENCE OF A CAUSE OF ACTION FOR NEGLIGENT PLACEMENT

▪ ¶ 11 In their original complaint, the Savages brought a cause of action against the Village for, among other things, negligence in failing to warn the Savages of J.B.'s criminal record which included "serious sexual deviancy" and "habitual molestation of young children." The Savages allege that the Village's negligence resulted in the sexual abuse of their child by J.B. In their briefs and at oral argument, the Savages characterized this claim as one for negligent placement and argued that such a cause of action is cognizable under Utah law. The Village disputes the Savages' characterization of the law and claims that Utah courts have "never recognized a common law cause of action of the nature alleged by the Savages."

¶ 12 This court has never explicitly recognized a claim for negligent placement. In *Little v. Division of Family Services,* however, parents whose autistic child died while in a foster home providing "specialized assistance" for autistic needs filed suit against the Division of Family Services "alleging [that] negligent conduct" in the placement and treatment of their daughter "culminated in [her] death." 667 P.2d 49, 50–52 (Utah 1983). We held that the Division of Family Services, as a placement agency, could be held liable for its failure "to properly evaluate the foster home, its failure to supervise [the child's] placement and its failure to protect her from harm." *Id.* at 52. We held that this was a valid cause of action because "[t]he risk that [an autistic child] would injure herself was great. The proven facts that the State knew that she was autistic or manifested autistic symptoms justified the imposition of a special duty." *Id.* at 55. Although we did not expressly use the term "negligent placement," and the factual circumstances were slightly different in that the parents of the child placed in the foster home sued for damages arising from that child's death, *Little* does provide strong support for the principle that a tort exists for the negligent placement of a child in foster care.

▪ ¶ 13 As a placement agency, the Village has a "special duty," similar to that of the Division of Family Services in *Little,* to place children in foster homes with regard to the welfare of the child being placed and other persons in the home. It is a reasonably foreseeable risk that a child with a known history of sexually abusing young children might sexually abuse again if placed in a home with young children. " 'Whether the law imposes a duty does not depend upon foreseeability alone. The likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon [a placement agency] must also be taken into account.' " *Id.* at 54–55 (quoting *Lance v. Senior,* 36 Ill.2d 516, 224 N.E.2d 231 (1967)). We do not think that the Village's duty to notify the Savages of J.B.'s past behavior and to take reasonable

precautions against harm to other children in the foster home is too burdensome when weighed against the potential harm of continued sexual abuse. "When children are involved, the duty to look out for their safety is increased." *Wheeler v. Jones,* 19 Utah 2d 392, 431 P.2d 985, 988 (1967) (finding that additional safety precautions should have been taken at a pool frequented by children). Placement agencies such as the Village have a special duty to prevent abuse to and by the children they place in foster homes. *See Little,* 667 P.2d at 52. Because of this special duty and "the fundamental principle of American law that victims of wrongful or negligent acts should be compensated to the extent that they have been harmed," *Condemarin v. Univ. Hospital,* 775 P.2d 348, 354 (Utah 1989), agencies like the Village should be held liable for their negligence in the process of placement that results in sexual abuse. This conclusion is consistent with and follows from a long line of cases interpreting Utah law which, like *Little,* did not expressly use the term "negligent placement," but nonetheless clearly implicated similar negligence principles. These cases recognize causes of action for negligent placement, negligent supervision, and negligent hiring resulting in sexual assault. *See O'Neal v. Div. of Family Servs.,* 821 P.2d 1139, 1140–41 (Utah 1991) (implicitly recognizing a negligent placement claim against a placement agency for resulting sexual abuse); *Birkner v. Salt Lake County,* 771 P.2d 1053, 1059 (Utah 1989) (allowing plaintiff to sue county for negligent supervision and hiring of a social worker who allegedly sexually assaulted the plaintiff); *Doe v. Arguelles,* 716 P.2d 279, 283 (Utah 1985) (recognizing negligent supervision in prescribed treatment of a juvenile who later committed sexual abuse). Thus, negligence in the placement of a child in foster care is a cognizable cause of action and was appropriately pled in this case.

## III. APPLICABILITY OF UTAH CODE SECTION 78–12–25.1

¶ 14 We next look to section 78–12–25.1(5) of the Utah Code to determine whether it serves as a bar to the Savages' claims. Section 78–12–25.1, "Civil actions for sexual abuse of a child," reads in relevant part as follows:

(1) As used in this section:

. . . .

(e) "Negligently" means a failure to act to prevent the child sexual abuse from further occurring or to report the child sexual abuse to law enforcement when the adult who could act knows or reasonably should know of the child sexual abuse and is the victim's parent, stepparent, adoptive parent, foster parent, legal guardian, ancestor, descendant, brother, sister, uncle, aunt, first cousin, nephew, niece, grandparent, stepgrandparent, or any person cohabitating in the child's home.

. . . .

(g) "Sexual abuse" means acts or attempted acts of sexual intercourse, sodomy, or molestation directed towards a child.

(2) A person shall file a civil action for intentional or negligent sexual abuse suffered as a child:

(a) within four years after the person attains the age of 18 years; or

(b) if a person discovers sexual abuse only after attaining the age of 18 years, that person may bring a civil action for such sexual abuse within four years after discovery of the sexual abuse, whichever period expires later.

(3) The victim need not establish which act in a series of continuing sexual abuse incidents caused the injury complained of, but may compute the date of discovery from the date of discovery of the last act by the same perpetrator which is part of a common scheme or plan of sexual abuse.

(4) The knowledge of a custodial parent or guardian shall not be imputed to a person under the age of 18 years.

(5) A civil action may be brought only against a living person who intentionally

perpetrated the sexual abuse or negligently permitted the sexual abuse to occur.

Utah Code Ann. § 78–12–25.1 (2002).

¶ 15 The district court found that a plain language interpretation of subsection (5) of the statute bars the Savages' claims; accepting the Village's argument that the statute creates and defines the cause of action for sexual abuse of a child in Utah as abuse committed only by a "living person." Since it is a corporate entity, it is not a "living person" as required in subsection (5) of the statute, and therefore cannot be held liable for injuries resulting from the sexual abuse of a child.

¶ 16 The Savages argue that the statute is simply a delayed discovery statute of limitation and therefore not applicable as a bar to their claims against the Village, since their claims were filed within the normal statute of limitation and do not rely on the extended time period provided by section 78–12–25.1(2), designed to deal with repressed memory cases. The Savages rely on the legislative history, placement, and previous interpretation of the statute to support their position. We agree that section 78–12–25.1 is a delayed discovery statute of limitation that applies only to extend the time for filing child sexual abuse claims where victims have repressed memories; the Savages' claim for negligent placement is not an action for the tort of child abuse (akin to assault), but rather a claim for negligent performance of a duty to exercise due care in placing a child in a foster home.

¶ 17 We grant no deference to a district court's interpretation and application of a statute, instead reviewing for correctness. *Field v. Boyer Co.*, 952 P.2d 1078, 1079 (Utah 1998).

¶ 18 It is a well-settled principle of statutory construction that this court looks "first to the plain language of the statute" when interpreting meaning. *Stephens v. Bonneville Travel, Inc.*, 935 P.2d 518, 520 (Utah 1997); *see also Arredondo v. Avis Rent A Car Sys., Inc.*, 2001 UT 29, ¶ 12, 24 P.3d 928; *C.T. v. Johnson*, 1999 UT 35, ¶ 9, 977 P.2d 479; *Nelson v. Salt Lake County*, 905 P.2d 872, 875 (Utah 1995); *Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994); 2A Sutherland Statutory Constr. § 46:1 (6th ed.2004). An equally well-settled caveat to the plain meaning rule states that a court should not follow the literal language of a statute if its plain meaning works an absurd result or is "unreasonably confused, inoperable, or in blatant contravention of the express purpose of a statute." *Perrine v. Kennecott Mining Corp.*, 911 P.2d 1290, 1292 (Utah 1996). Above all, "[t]his court's primary objective in construing enactments is to give effect to the legislature's intent." *Gohler v. Wood*, 919 P.2d 561, 562 (Utah 1996).

¶ 19 The Savages point out that the statute, when read in accordance with its plain and ordinary meaning, creates an absurd result in a number of situations. Most notably, if subsection 2(a) is read literally, an "action for intentional or negligent sexual abuse suffered as a child" can only be filed "within four years *after* the person attains the age of 18 years." Utah Code Ann. § 78–12–25.1(2)(a) (emphasis added). Such a reading of the statute would mean that a sexually abused minor would be barred from pursuing any civil action against an assailant until the victim reached the age of eighteen. In this case, under a literal reading of that portion of the statute, John Doe would be barred from filing a cause of action for at least twelve years. Such a result would be absurd.

¶ 20 The legislative history of section 78–12–25.1 shows that the legislature intended merely to expand the rights of sexual abuse victims with repressed memories, not to create and define a new cause of action encompassing all actions in any way related to child sexual abuse. The original bill, entitled "An Act Relating to the Judicial Code for Sexual Abuse of a Child; Providing a Four Year Statute of Limitation in Civil Actions for Negligent or Intentional Sexual Abuse of a Child; Providing for Extension of the Stat-

ute of Limitation Period Where Sexual Abuse is Discovered After Age 18" and its subsequent discussion in the Utah House of Representatives and Utah Senate, reflect an intent to extend the current statute of limitation for filing child sexual abuse actions because legislators believed many victims with repressed memories were unable to file claims at all due to the delayed discovery of the abuse. H.R. Reg. 92, 49th Leg. (Utah 1992). During the House and Senate debates of the bill, there was substantial dispute about the definition of "negligently" as used in subsection (1) and the applicability of the statute to relatives beyond the immediate family. There was, notably, no discussion of the "living person" language in subsection (5). *Id.* Neither the sponsors of the bill, in their introductions containing background information and justification for the bill, nor the representatives and senators, in thorough discussions of the bill's potential effects and problems, mentioned the phrase "living person." *Id.*

¶ 21 Other factors affect our reading of the statute as well. First, the statute is placed in Chapter 12 of Title 78, entitled "Limitation of Actions." The statute's placement in this chapter was an important factor in two previous cases wherein we described section 78–12–25.1 as a delayed discovery statute of limitation rather than a statute that creates and defines a new cause of action. *See Roark v. Crabtree,* 893 P.2d 1058, 1060 n. 4 (Utah 1995); *Olsen v. Hooley,* 865 P.2d 1345, 1348 n. 2 (Utah 1993). In *Roark,* we stated:

Roark contends that section 78–12–25.1 created a new cause of action entitled "sexual abuse of a child." However, chapter 12 of Title 78, "Limitations of Actions," *addresses solely the applicable statutes of limitations for various causes of action.* Section 78–12–25.1 extends the statutory period for a specific type of assault and battery, namely, sexual abuse of a child, until four years after discovery of the sexual abuse in those cases in which a person discovered the sexual abuse only after attaining the age of eighteen years.

893 P.2d at 1060 n. 4 (emphasis added).

¶ 22 The language of subsection (5) might be interpreted as creating and defining a new cause of action for "negligently permitting sexual abuse to occur," as the Village argues. The restriction that such a claim could be brought "only against a living person" makes sense in that context because only a living person could "intentionally perpetrate" sexual abuse—defined as "acts or attempted acts of sexual intercourse, sodomy, or molestation"—of a child. A corporate or other nonliving entity cannot physically commit such acts of sexual abuse, and therefore the statute reasonably excepts such entities from its treatment. We believe subsection (5)'s clause "*negligently* permitted the abuse to occur" refers back to the term "negligently" as defined in subsection (1)(e), meaning the allowing of abuse by the specific relatives listed.

¶ 23 The Savages do not claim that the Village "negligently permitted sexual abuse to occur" to their son. Instead, they claim that the Village negligently placed J.B., a youth with a documented history of sexual abuse, in their home without adequately disclosing that history. A claim for negligent placement is different from a claim for "negligently permitting sexual abuse to occur." A corporate entity and placement agency like the Village, which cannot physically commit the sexual abuse described in section 78–12–25.1, or as subsection (5) indicates, negligently permit such sexual abuse to take place, can nevertheless be liable for negligently placing children in circumstances where it knows or should know they are at risk of being abused or perpetrating abuse.

¶ 24 After examining the statute's plain language and legislative and procedural history, we conclude, as we explained in *Roark,* that this statute is simply a delayed discovery statute of limitation for victims with repressed memories who were sexually abused as children. *See Roark,* 893 P.2d at 1060 n. 4. By enacting section 78–12–25.1, the legislature expanded the rights of sexual abuse victims with repressed memories; there is no reason to believe it intended to create and define a cause of action for sexual abuse of a child. Thus, section 78–12–25.1 does not directly affect causes of action for negligent

**1250**

placement. We therefore hold that section 78–12–25.1 only applies to victims of child sexual abuse with repressed memories, and this statute does not touch any civil claim for negligent placement.

## IV. CONSTITUTIONAL CLAIMS

¶ 25 Because we hold that a civil claim for negligent placement is not affected by section 78–12–25.1, we do not address the Savages' constitutional arguments. *Provo City Corp. v. Thompson*, 2004 UT 14, ¶ 22, 86 P.3d 735 (stating that we do not issue an advisory opinion "as to a statutory provision unnecessary to the outcome of the case").

## CONCLUSION

¶ 26 We hold that the district court did not abuse its discretion in permitting the Village to amend its answer to include section 78–12–25.1. We also hold that negligent placement is a cognizable cause of action under Utah law. Finally, we hold that section 78–12–25.1 is only a delayed discovery statute of limitation; civil actions for negligent placement are not affected by this statute. Section 78–12–25.1 should not have been applied as a bar to the Savages' claims, and the district court therefore erred in granting the Village's motion for summary judgment. We reverse and remand for further proceedings consistent with this opinion.

¶ 27 Justice PARRISH and Justice NEHRING concur in Chief Justice DURHAM's opinion.

WILKINS, Associate Chief Justice, concurring in the result:

¶ 28 I concur in the analysis and result reached in Section I, and the overall analysis and the results reached in Sections III and IV. I agree that section 78–12–25.1 is not applicable to the claims brought by the plaintiffs against Utah Youth Village, but having reached that conclusion, see no need to go further.

¶ 29 Chief Justice Durham has presented her case for "recognizing" a cause of action for negligent placement. I see no need to do so for two reasons. First, the question is not raised as a matter of importance in the appeal by either party. Second, the existing law relating to negligence is sufficient to deal with a wide variety of cases, including this one, and the "recognition" of additional specific causes of action simply invites the later "discovery" of a variety of other new rights and remedies. I think it unnecessary and unwise to reach the question at all.

¶ 30 Justice DURRANT concurs in Associate Chief Justice WILKINS' concurring opinion.